Good morning, Your Honors. May it please the Court, this is a complex factual dispute that should not have been resolved at summary judgment. It was resolved at summary judgment incorrectly for three basic reasons. First, the District Court incorrectly read key provisions of the contract. Second, the District Court misapplied both New York law and Fourth Circuit precedent. And third and last, the District Court inappropriately weighed contested facts against the non-moving party in violation of basic Rule 56 precedent. Had those errors not been committed, this case would have gone to trial and the Court should reverse on those grounds. Moving first to Invoice 1, which is the first issue we discussed in the brief. I actually think on this one there's a lot of common ground. The District Court found that there was a factual question about whether Freddie Mac had inappropriately refused to approve milestone payments, which are essentially the key junctures in the contract for whether the work had been successfully performed. The parties agree that unless and until that milestone of payment is credited, CSC had no duty or no right to submit the Invoice 1. And the District Court made that finding and found a tribal issue with respect to Invoices 2, 3, and 4 on that ground. Those claims have since been settled. The only reason the District Court found that Invoice 1 should be treated differently is because of the way it read the 90-day provision in the contract. And we think that was a clear error of law. The contract says that all invoices must be submitted within 30 days, once they're due. And again, they're not due until the milestone is approved. The 90-day provision operates on one specific set of invoices, and it's in the direct language of the contract itself. Those are invoices that are incapable of being determined at the time when they're due. So you might have a third-party vendor, you might have a work purchase order, you might not know the inputs for how to pay off that invoice. So you get an extra 60 days on those. And in that, it's not pretty clear from the language because it says that provision applies to such services and such invoices. It is not a general provision of repose, an outer limit generally for invoices. The District Court just read it wrong. And once that error is corrected, and I think my friend would concede if that is wrong, we have a tribal issue on the first issue we've raised. I think you had a procedural problem on Invoice 1 that you had raised in the brief, that the District Court decision to rely on that 90-day bar or 90-day exception, however you want to characterize it, was kind of sua sponte, that nobody had been arguing it. That's right. That the District Court granted summary judgment on a ground that had not been raised without giving notice or an opportunity to argue. That's correct. We're still arguing that? We are. And of course, the court could simply remand on that basis. And I think that highlights, we think it's such a substantively weak reading of the contract that we would encourage the court to go ahead and decide it. But of course, that is in this court's discretion. But I do think that highlights, Judge Harris, that not even my friend thought that was a winning argument. And they made every argument plausible in this case. I think if you look at the briefing and the record, we have a 2,000-page record. We have extensive briefing, extensive argument. If Freddie Mac thought that was a strong argument, they would have made it. Isn't the error whether the invoice is timely submitted? So the answer is yes. But not because they were submitted within a period of time, but because they were never. Were they submitted in the time period that you say is correct, the 90-day period? They were not. No, I'm sorry. We don't think the 90-day period applies at all, Judge Wilkinson. So they were never submitted. It's a factual truth that they were not submitted within 90 days. The issue is the condition precedent. So under the contract, you perform the work first. You then take the completed work to the client and say, we have successfully completed the project. They then either agree or disagree. It's only upon that agreement that you successfully completed the project that any clock starts, whether it's a 30-day clock or a 90-day clock. That clock never started because they never approved the completed work. And what the trial district court found was there's a provision in the contract that says they are for- These are invoices for change orders or not for change orders? This was not for change orders. This was not for change orders in any way? This is base charges. So base charges are- There's no need for prior approval. Correct. Correct. So on invoice one, what happens is there's a milestone for a certain kind of IT transition work. We say this is milestone nine if the court's interested in the particulars. We say we successfully completed that work. Freddie Mac says we didn't. The contract says, and this is the key point, the contract says they are forbidden from unreasonably refusing to approve those milestones. If that approval was unreasonable, we are excused from meeting that 30-day deadline. If it was reasonable, we are not excused and we did not meet it. But that's the triable issue is whether they were unreasonable and refusing to approve the milestone. And we don't have a fight about that because on invoices two, three, and four, and these were a bundle of invoices, on invoices two, three, and four, the district court agreed that was a triable issue. The only reason the district court found that it wasn't triable on invoice one is because of the way it read this 90-day period as an outer limit that applies to all invoices. And that's just not the appropriate way to read the language in section 6.1D of the contract. You did mention the change orders, though, Judge Wilkinson, and that is the second issue. And that is the issue with respect to the land remediation. We also think there was an error of law committed with respect to that allegation we made. Everyone agrees. On the earlier invoices, does the issue come down to one of the reasonableness of the submission? I mean, is this an individual inquiry as to the reasonableness of the submission? It is an old-fashioned fact issue that goes to the trier of fact, yes. Now, you don't get to that issue if you agree with the way the district court read the 90-day provision. If you disagree with the way the district court read the 90-day provision, as we do, then, yes, you go to a jury, well, not a jury here, but a trier of fact on whether the decision to reject milestone nine was reasonable or unreasonable. Can we go through each one of these invoices? Fortunately, no. Fortunately, because of so much has settled out on the milestones, I think that's the only milestone left. But there are, I will confess, this is, as I mentioned, this is a 2,000-page factual record. There are dozens of depositions. There is a ton of testimony. This is a real trial. There are factual disputes between the parties. And I think what happened here, unfortunately, was Judge O'Grady jumped the gun. I think it's pretty clear from the record that Judge O'Grady was weighing contested facts in the favor of the party who he thought had the better of the argument. Now, given how voluminous the record here is, I appreciate the impulse, but it simply isn't appropriate under Rule 56. For example, not to jump too far ahead, but for example, on the land remediation, there is a real factual issue here about whether we had an oral modification of this contract. Now, we submitted, first you start with the fact that there was performance. And under New York law, and I think this was maybe lost a little bit in the briefing, and I'd like to emphasize it a little bit more. Under New York law, if there's an executory oral agreement, you're in trouble if you're in my party's position. If you just have an oral agreement to say, we're going to change the contract, you have a problem. Because one, you have an agreement in the provision that says, all changes must be in writing. And two, you have a statute under New York law that enforces that. But once there's performance, all of that switches, because it follows directly from the common law. And there's a concern about equitable estoppel. When a party induces another party to engage in a significant project, and then claims they didn't approve it later, that becomes a fact issue for the judge. And that's exactly what happened here. We submitted evidence that we performed this land remediation over a couple-month period instead of over a five-year period. There's no disagreement that we did that work. We then submitted an invoice saying, please pay us for the work. And Freddie Mac said, no, you didn't get a written change order. And we said, well, we had an agreement to do the work and not do it. And we submitted evidence to that effect. We submitted the evidence of Mr. Chisholm, both through his deposition and declaration. So you're saying you had prior approval before the work that you were doing pursuant to the change order? That's right. So we had prior oral approval, yes. I mean, you can understand why, from Freddie Mac's point of view, they would want the prior approval because they would need to decide whether the change order was in fact a change order or whether it was something within the scope of the contract, of the already negotiated contract. I mean, there's always a dispute in these questions between what is an actual change order and what is within the agreed terms. Sure, I agree. And this is where I think performance becomes the key point of discussion here. But I think the trial judge found you had gone ahead with some of the work because it had never been authorized. It had never been properly authorized by Freddie Mac. And that pre-authorization was absolutely necessary before you undertook the work that was the subject of the change order. And that you were submitting these invoices without obtaining any kind of prior approval. But that's the question, Judge. So if you're... Well, just tell me what's wrong with that view of it. So the word written versus the word oral is where the fight is here. So if implicit in your question, Judge Wilkinson, is you had no prior written approval and the contract required written approval, we accept that. What do you say constitutes approval? We had an oral agreement. And New York law permits oral modification. There was a meeting. The district court said, right, that there was no evidence in the record of an agreement, that there was evidence suggesting that conversations about maybe revising the contract had occurred, but no evidence as to an actual agreement. So two responses. One, this is where I think Judge O'Grady misunderstood how New York law works once there's partial performance. So is once there's partial performance that is inconsistent with the written instrument, whether that evidence of oral agreement is for the trier. Now, the second issue is we did actually have evidence. Judge O'Grady didn't like the evidence. We had submitted the evidence from Doug Chisholm, who said he agreed with Freddie Mac to have this oral contract. He also submitted a declaration on this point. And my friend is going to, I'm sure, criticize that. And this is important. Well, I don't understand how a contract with this degree of detail and at this degree of length is subject to oral modifications. And normally these contracts, and I think this provision was present here, which was that oral modifications were not permitted. So this is where New York law controls. And the parties agree on that. And Judge Wilkinson... This is where what controls? New York law. So New York law says, and we cited the cases in our brief that stand directly for this proposition. If even where the contract says in bold, highlighted, 18 point font, you may not have oral modifications of your contract, you can still have oral modifications of the contract. You may disagree. This is... And I understand you may disagree, but this is exactly what... And I actually think it makes sense, Judge Wilkinson, because this is what the common law says about equitable estoppel. How would you proceed with just oral modification and in view of the contractual provision that none was permitted, you would clearly be proceeding at your own risk. I mean, are we going to have to go through, or is the jury going to have to go through each? And there were quite a number of these invoices that were submitted. And the reason given for the rejection was that they were unauthorized. So they're going to have to go through each of these invoices and find out whether there was some sufficient oral modification. All the invoices come as a bundle on this one. So they won't. They won't, Your Honor. Didn't they involve different kinds of work and different projects? No. So there's Invoice 25, which is the principal labor for the land remediation. And then Invoices 34 to 52 are the monthly, essentially, maintenance charges for running the network. Aren't they maintenance of different things? Wouldn't they each require a separate approval? We don't think so, no. They're part of the oral agreement that was reached here. So if I could just take one step back. That's slippery. If I respectfully would disagree, I don't think it is. So this project was supposed to be done initially over a five-year period. This, what they call, land remediation. Cleaning up the network. It then turns out that it's in such disrepair when my client takes over the project that no other work can happen. It's an earthquake in the deal. No other work. I can believe that. But the fact that their infrastructure is in a shambles, and I'm prepared to accept your view on that, that still doesn't relieve your client of the need. And it would seem that any prudent businessman would proceed in this way. But you're going to do work that you think is arguably, in addition to what you have agreed in the contract, that you would, just as a matter of prudence and precaution, get some kind of written approval. Because you know in litigation that an oral modification in a contract which is this highly reticulated is going to be the subject of great suspicion. So why not do it according to the contract terms? And the oral modifications to which New York law may address itself would probably be oral modifications in a more sympathetic context than between two highly sophisticated, one business party and your client and another quasi-governmental entity. And you can expect business entities and large entities like this to turn square corners. Whereas if there was some imbalance on a part of the contracting parties or it's some situation where there was just a one-time thing and there was sufficient corroborating evidence or whatever, well, maybe the oral modification is OK. And I'm prepared to say New York law doesn't erect an absolute bar to that. But it sure would seem to erect a bar given what we are facing here contextually. May I briefly? Yes. So two responses, Mr. Wilkinson. If the point is, and I take it this is your point, our client should have gotten the change order, they would be in a much better situation if they had. Point taken. No question. But here we are. And New York law doesn't just think about who should have done a better job in their contracting. They also think about, and this is I think important, that one party should not enjoy the fruit of another party's labor inequitably. And if we could just take it very briefly from the other end of the equation. This wasn't like I left my house one day, went on a vacation, came home the next day and my house was painted. And I'm wondering what happened and who approved this work. This was a substantial piece of work that the parties were working on together, ordering the equipment, ordering the assets, accepting the labor, watching the clock. All the more reason when you undergo that sort of expense that you would seek some sort of cover in the form of prior approval. I agree. But New York law does not punish my client for that the way that Your Honor may want it to. New York law says if we have partial performance and we can show that we relied on their oral statements to engage in that performance, we get to go to a trier of fact. And all we're asking is for the court to enforce the body of law that the parties contracted to. Thank you. Thank you. Mr. Oaks. Thank you. May it please the court. Judge Wilkinson, I think you hit exactly on the issue. This is a breach of contract action between two very sophisticated commercial parties who spent months negotiating what the district court called one of the most comprehensive agreements it had seen. There are no novel issues to be decided here. The district court applied well-established New York law and the federal rules of civil procedure and granted summary judgment against a subset of CSC's damages claims either because they're expressly contrary to the express terms of the contract or because after extensive discovery... What about the timeliness issue? Sure. I'll jump right to invoice one, which is the... Your opposing counsel says the district court simply misread the time period within which the invoice is needed to be submitted. Sure. Everything that CSC complains about is directly addressed by the contract here. So the district court didn't misread the contract. There are only two provisions in the contract that allow for invoicing. One is for fixed charges. Those must be submitted within 30 days of the end of the month in which those services were provided. And then there is a longer 90-day provision for indeterminate or flexible charges. CSC admittedly didn't meet either one of those deadlines. They didn't invoice within 30 days and they didn't invoice within 90 days. Were all of the invoices submitted after the 90-day period or is there a question here of what type of invoice should be submitted within the 30-day period and what type of invoice had to be submitted within the 90-day period? Or does the type of invoice matter or were they all submitted in an untimely fashion? So for the base charge ones that were tried, that were heard at the summary judgment argument, three of them were billed within the 90-day period. That was two through four. And that's why the court treated those differently. Invoice one was billed 125 days after the month. So outside the 90-day window. And that one, he said, no matter what CSC... So you're saying that the district court recognized the 90-day period for the type of invoice that was required to be... The district court recognized that as a best case scenario for CSC. This should be a 30-day provision, but best case... It didn't apply the 30-day across the board? It did not apply the 30-day across the board to all the invoices. It said, even if you argue, even if you say that you could not have submitted this because a payment milestone was not reached yet within the 30 days, you certainly should have done it within the 90 days because that's the longest provision that the contract provides for any invoice. How many invoices are we talking about that were submitted between the 30 and 90-day period? We're talking about none today. None? None. That's correct. Because there's no cross appeal on two through four. Correct. That's right. Those have been resolved by the parties. That was not preserved for appeal. That's been settled. So that is done. We have one invoice, which is invoice one, that was submitted beyond the 90 days. The whole 90-day thing, it only affects invoice one. Well, it also affects all of invoices 34 through 52 also, but that's a secondary argument because those relate to a change order. Those invoices rely on the lack of authorization. That's correct. As a secondary argument, they were also submitted more than a year after termination. They came out of nowhere. So that's a secondary argument. They were never authorized by a change order. And so for that reason, that's the primary argument. But secondarily, again, not at all within the 90-day period. On invoice one, just before you move on, can I ask you to respond to the argument that the district court improperly relied on this 90-day theory to distinguish that the parties had treated one through four together, and it was only the district court who came up with this 90-day when distinguishing them, and he never gave anyone a chance. He didn't give your colleague a chance to argue his reading of this provision. We did argue the 30-day provision, and we believe that that was the correct one because these are fixed-price invoices. I think what the district court was doing was anticipating that CSC could say, because this project milestone wasn't approved, maybe it becomes an indeterminate invoice, and we get the 90-day period. But, you know, this court has held. And you're arguing to us that it doesn't matter. It doesn't matter. That's right. And the pension benefits case that we cited from the Fourth Circuit says if the facts aren't going to change the analysis, then it doesn't matter if the court raised it so spontaneously because there's no fact that could change that they submitted this at 125 days. And they didn't come forward with anything in the appeal brief. We would have looked for this evidence or we would have presented different evidence. The contract says what it says. 90 days is the absolute outside limit. Why did this whole relationship descend into such dysfunctionality? I mean, it seems like the appellant has a strong argument in the fact that when they got into it, they found that the whole IT situation in Freddie Mac was abominable and that it was worse than anybody could ever have imagined in terms of how far beyond that they were updating it. And it was just sort of way behind the curve. So that's an interesting point that he raised. You know, you have the point that... We have a contract. Yeah, well, you have the contract, but, you know, you also, I guess, the straw that broke the camel's back was the failure to provide backup on the July 4th outage. But this, you know, normally construction contracts, they, very few of them go from start to finish without some sorts of disputes. But why did this one just go south so completely? So two points I would like to raise. First off, the point that he said that the network was way worse than they anticipated when they got here. The interesting fact is that they did a network assessment in October. They used AT&T as a subcontractor. They did a network assessment and they received the report on October 27th. They didn't sign this contract prior to execution of this contract in November. So they knew exactly what the network looked like. They never really know until you get into it. Well, they paid a lot of money for this network assessment by AT&T to look at every piece of equipment in the network, look how old it was, look how fast it had to be refreshed. They had all of AT&T's recommendations and then they signed the agreement and said, OK, we can do it on this timeline. We can do it at this price and we can do it with this pacing. And so they knew exactly what they were getting into before they did this. Why did the contract go so badly? If we look at the CSC lessons learned document that we talked about quite a bit throughout this agreement, CSC conceded they didn't have the right people on this. They went through six transition executives. They were only supposed to have one and they were supposed to get approval to change it out. They had six transition executives in a three-month period. They couldn't get the right people here. They couldn't do the work. They said that they sold a product that wasn't ready for prime time. They said they didn't have adequate resources. They had no deployment experience for the product that they were trying to deploy. So they got in. They tried to install it. Freddie Mac had to come in and help them because they were scrambling around like the Keystone cops. You say you're behind the curve and you say they're over their head. Right, but the contract, if we go back to the contract, the contract address is exactly what we're supposed to do when we get into these situations. So there's an informal dispute resolution and there's a formal dispute resolution procedure. So they say, well, we didn't approve the program milestones and section 8.2 of the work order says any disagreement about the completion of a program milestone will be escalated through the governance process for dispute resolution. And if you look at the dispute resolution provisions, this is a joint appendix 650 and 651, it says if you start the dispute resolution process, that will toll the time limitations. So if they started the process... When did they say they should have submitted this invoice? And the district court made the point, well, they essentially were claiming for themselves the right to sit on an invoice indefinitely. That's exactly what they did. The time deadlines were advisory almost. Apparently all the contract provisions were advisory. So they were going to sit on these, first of all, most of the change orders, they never even submitted. We just didn't get around to submitting the change orders. The invoices, they didn't start invoicing until... What you're saying essentially is that their billing procedures were as sloppy as their technical expertise. That's absolutely correct. I've never heard of a major contractor not submitting you timely invoices. That's what I don't understand. It seemed to me you'd want to get paid sooner rather than later. That's exactly right. And it also would seem to me from the standpoint of Freddie Mac that they would want to know exactly what they were on the hook for. That's right. And section 6.7 is a disputed charge provision. So if they submit an invoice, we say it's not right, then it goes into the dispute process and we get that resolved right away. But we don't wait... When were these invoices actually submitted? They're all disapproved either in part or in whole because they're untimely. When were they actually submitted? So the contract was terminated in August of 2015. Invoices 34 through 52, which were these extra service charges, they were submitted in, I think, September of 2016. So a year later. So after the litigation had started, long after the contract was terminated, long after any dispute resolution procedure should have taken place, they sat on these for another year and then said, oh, by the way, here's $4 million in charges. I don't understand the business model or the business procedure of computer sciences in this kind of situation. I don't understand the unwillingness to get prior approval for the change orders. I don't understand the willingness to go with oral modifications. No business does that. Most business for change orders would get written prior approval of the change order. Most businesses want to get paid and want to get paid on a timely basis. Why would they not do that? And then they initially accepted faults for the failure of a secondary backup in the July, over the July 4th weekend. But it seems to me from start to finish, whether it be with the work to be performed or whether it be with the billing procedure, that it's just sloppy. Just sloppy, sloppy. Could not agree more. The contract is very clear. Section 3.1b of the Master Services Agreement. If CSC performs any additional functions without being authorized via a duly executed change order, they will have deemed to have done the work at no additional charge. It's as clear as can be. No oral modifications. All change orders have to be in writing. The change orders have to proceed the work for the very reason that your honor mentioned before. Under 10.1c of the work order, it says, so that Freddie Mac can assess whether or not the services are in scope or they constitute new services. And then the contract provision 22.1b has another clause that says, any disputes over whether these are new services or existing services, which happens all the time in big contracts, get resolved through the dispute resolution procedures. I just haven't seen many government contracting cases in which the party contracting with the government actually proceeded both in its billing and performance along this course. Under an alleged oral modification, which is on the flimsiest grounds that you could imagine, where the guy says, well, we agreed that we would do some work and Freddie Mac never said they wouldn't pay for it. That's not an oral modification. I did some stuff and you didn't yell up and down that you're not going to pay for it. I think this is a total question of indefiniteness. I mean, you know, with an oral modification, at least when the oral modification is submitted, the terms of the oral modification are proffered, but a lot of contracts fail for failure to agree on terms and particularly oral modifications fail for failure to make explicit what the terms of all these oral modifications are. None of the declarations they submitted had any details about the timing of the work, the pricing of the work, what equipment was going to be provided. Who approved them, for how much, what was the scope of the modification, for what work? That's correct. And under the contract, a specific person has to give that authorization. It's in the governance structure. And they say they talked to somebody in IT who generally thought that the work was probably approved. That's not an oral modification of an agreement. I want to talk a little bit about the termination for cause versus convenience issue. The only evidence, it's undisputed, is this second supplemental report of their expert that was submitted after the close of discovery, after the close of expert depositions, the night before the summary judgment motions were to be filed. It's an abuse of discretion standard for the court. This is pretty easy, pretty routine. Rule 37 calls it an automatic sanction that triggers without motion. So it's not like the court has to do a lot of thinking here. The court just needs to decide, was it harmless? And is there any substantial justification for the lateness? The court applied that exact same test. The court said there's no justification whatsoever for them being so late. They never sought leave of court to submit a second supplemental report. And the information that their expert relied upon to reach that second supplement were interviews of CSE's own witnesses. So they had that information at hand the entire time, throughout the whole discovery period. They could have done those interviews long ago. They could have submitted declarations from their own employees to say that it was Freddie Mac's fault for something. But they had to wait until after the close of fact discovery to try to manufacture some reason in light of the overwhelming undisputed evidence that it was CSE's fault for not putting in a redundant circuit and for not testing the system and the disaster recovery before they went live with it. So this was a routine decision that the judge gets broad discretion on. He looked at it. He said the deposition was complete stonewalling. The report was stonewalling. The evidence was in your hands. And I will apply the Rule 37 sanction of excluding the report. And that's exactly what Southern states the decision from this court says is appropriate. That is the exclusion. That is the rule for Rule 26 failures, especially in light of when it's evidence that would help the party that wanted to get it in. I mean, they wanted to get this evidence in and they just didn't do it. The alternative exclusions, which are like attorney's fees and other things, are there because sometimes they're disclosing evidence that would have been or failed to disclose evidence that would have been helpful to Freddie Mac. And in those cases, they say sometimes exclusion's not the right remedy because obviously we would want the evidence in at that point. So they need to come up with something else. But the rule itself says if a party fails to provide the information as required by Rule 26, the party is not allowed to use the information. And the advisory committee notes say it is a self-executing sanction. The automatic sanction provides a strong inducement for the material that the disclosing party would expect to use as evidence. So there's no indication here that the court thought its hands were tied, that it couldn't do anything else. The court was frustrated with CSC not coming forward with the evidence, not seeking leave, and then putting us through a deposition where the expert said I haven't reached any opinions yet, and then waiting till the night before summary judgment to dump in this new report based on evidence that they had at hand all along. The last big category is these transition costs. Transition costs, we moved, they dumped in a category of $4.3 million in labor and travel expenses that they just called transition costs onto their damages claim. They never explained what it was. Their 30B6 witness couldn't say what it was. But at summary judgment, we moved to strike those. And CSC said, well, we get these as balance sheet amounts. And balance sheet amounts is something that's recoverable under the termination program. But the contract, section 2.1 of the contract says that transition costs are only recoverable through these milestone payments. Milestone payments are the fixed payments that you get along the way as you hit a milestone. So you can't get transition costs as balance sheet amounts. And the district court rightly said, these aren't balance sheet amounts. These should come in as milestone payments. So your argument is stricken here. Now on appeal, they've abandoned this balance sheet amount argument altogether. And they said, OK, well, then we get them as milestone payments. Well, they never raised that at the district court. It's a brand new argument. And under the Domino Sugar case and a long line of Fourth Circuit cases, if you don't raise an issue in an argument at the district court, you don't get to raise it for the first time on appeal. So that's waived. And in addition, all of the milestone payments have been settled and resolved by the parties. So the parties got together after the summary judgment ruling, looked at all the remaining milestone payments, and they paid some, they disputed some, but they settled those and those are resolved. That's all part of the settled claims. The milestone payments were not preserved for appeal. So not only is the argument waived because it's new, but they're fully satisfied. So they can't now say, oh, those transition costs that we tried to get as balance sheet amounts, now we're going to get them as milestone payments. That's already been compromised. And the contract at 2.1 says these milestone payments are all fixed charges and that fully compensates CSE for everything under the transition. These are what they're trying to submit are not fixed charges. These are some variable transition costs, not the contractually specified milestone payments. So, again, we don't really know where these transition costs are coming from. They've never been able to explain it. They couldn't explain it to the district court, but it's a brand new argument that they're trying to present here for the first time. The last claim that they've tried to appeal is the breach of the implied duty of good faith and fair dealing. This is a breach of contract case. The district court recognized it's a breach of contract case. Every contract has an implied duty, but it doesn't give rise to an independent cause of action for breach of implied duty. If you breach the implied duty, you breach the contract. Here, when we asked them the interrogatory, what's the difference between your breach of implied duty and your breach of contract claim? They listed word for word over, the answer went over for a page, the exact same facts, the exact same elements. So it's... If you haven't breached the contract, you haven't breached the implied duty. It's completely duplicative. The only time that New York recognizes this separate breach of implied duty is in cases where the parties truly do have some relationship, like a fiduciary relationship. These are two arms length commercial parties. There's nothing implied other than just the contractual duties. The contract spells out exactly what everyone's... May I just finish this last sentence? So like one of the implied duties, they say is, you didn't make your contract payments in bad faith. Well, that's a contractual duty. Either you made the payments or you didn't make the payments. If you don't make the payments, it's a breach of contract. It's not a breach of implied duty to make the payments. I think that's fairly standard. Thank you, Your Honor. Judge Wilkinson, on the point you raised about it doesn't look like a good oral modification. You don't like, you know, the way our client behaved. I probably wouldn't want you on the jury. But this is a jury question, or in this case, a trial or fact question. This isn't... The points here go to conduct. They go to testimony. On the more oral modification is a jury question? Certainly, yes. Whether we in fact... You don't get to a jury on an oral modification unless there's something, unless there's a tribal issue of fact. And if the terms of the oral modification are unclear or who gave it is unclear or what the scope of the modification was is unclear, you don't get to a jury on that. I respectfully disagree. When you say unclear, I say that there is a dispute. We have testimony that the terms were clear. We have testimony that there was a specific meeting. We have testimony that they told us which assets to purchase. Is that memorialized anyway? It is in the Chisholm Declaration and Deposition Testimony. It is in the Moran Declaration and Deposition Testimony. Contemporary memorialization of all that? I don't believe so. But again, that really is... This is not a Rule 56 issue, though, Judge Wilkinson. I mean, the Mearson-Tilla standard is one thing. But to say, I don't think you can get home on the argument. It's not a Rule 56 issue. But I mean, it is basic to contract law, the fact that two parties disagree about the meaning of a contractual term or two parties disagree about the meaning of an oral modification. That doesn't by itself create an issue of tribal fact. I mean, people disagree about contract interpretation or oral modifications all the time. But that doesn't create an issue of tribal fact. There has to be something more concrete to it. So I agree with the point about if it's an interpretation issue, that is for the court. But you're then leaking into when you say a dispute about an oral modification. What's underlying that is a dispute about the behavior, conduct, and statements. If there's nothing to interpret, there's nothing for the jury to find. I mean, that's the problem. Oh, but... It's too vague. So I do not believe it was too vague. But we have evidence in the record that contradicts that assertion. And they have evidence in the record that they think substantiates that assertion. And that is a fact dispute. Now, on the invoice number one, I just want to make sure we're under... I think we're sort of missing each other on this. So let me try to use an example. If we have a contract, Judge Wilkinson, for you to build a pool in my backyard, and the contract says, I have to invoice you within 30 days of when I approve the completion of the project. So not when you finish making the pool, but when I say it's perfect. Then I show up and I say, Judge Wilkinson, here's the finished pool. And you say, I don't like the way the diving board is. It's not what I asked for. I don't like this. Go fix it. And we go through this over and over and over to the point where you never actually approve and say, yes, this is the pool I asked you for. I can never submit that invoice until you say yes. And they don't get a chance not to approve it unless the invoice is submitted. No, no, you're conflating the approval of the project and the submission of the invoice, which is just the money I'm owed for the project. So the project is fix these phone lines. Give me an e-fax service. Give me a network. And we say, we did that. We gave you a network. And they say, no, no, no, that's not the network we asked for. And we go round and round and round. And the district court found that there was a tribal issue about whether their refusal to say yes, you finished and completed the project. The only reason the judge said that we lose on invoice one is because it read this 90-day provision in a way that the contract never contemplated. The district court read the 90-day to say, no matter what kind of arguments we're having, submit the invoice within 90 days. But that's not what the contract says. It's only for a particular type of invoice where the charges are incapable of being determined. These charges aren't incapable of being determined. We have a milestone that they're refusing to approve. It's an apples and oranges issue. And here's how we know. And I didn't hear my friend offer an explanation to Judge Harris otherwise. He didn't disagree that they never raised this 90-day provision in the district court. Nobody did. Because I think if the court looks at it, the court will quickly realize it has nothing to do with this dispute. And so once you agree with us that that provision is an apposite, we definitely have a tribal issue on invoice one very quickly on the exclusion of the expert report. If you read Rule 37C1 the way my friend asked you to, you will be creating a circuit split with the Second Circuit. The language in Rule 37C1 says, even if it was late and even if it is sanctionable, the language says you may offer a sanction instead of exclusion. Now, the way my friend would read the rule is to say that language is null and void. It is a mandatory duty to exclude. May I finish my sentence, Judge? It is a mandatory duty to exclude no matter what. The Second Circuit has held otherwise. I would not read a footnote in one Fourth Circuit opinion to create a circuit split unless the court has further questions. Thank you, Counsel. We will ask the Clerk to adjourn the Court for the day and then we will come down and greet Counsel. This Honorable Court stands adjourned until tomorrow morning. God save the United States and this Honorable Court.
judges: Roger L. Gregory, J. Harvie Wilkinson III, Pamela A. Harris